# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MARK FRENCH | * | |
| Petitioner | * | |
| v | * | Civil Action No. RDB-18-879 |
| FRANK B. BISHOP, JR. and THE ATTORNEY GENERAL OF THE STATE OF MARYLAND | * | |
| | * | |
| Respondents | * | |

***

## MEMORANDUM OPINION

Petitioner Mark French filed this Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his convictions for attempted first degree murder, robbery, and two counts of use of a handgun in a felony from the Circuit Court for Baltimore County, Maryland. ECF 1 at 1. Respondents filed an Answer asserting that the one claim raised by French does not merit federal habeas relief because the claim concerns a matter of State law only and any constitutional claim implied by the petition has been waived. ECF 4 at 29. French filed a Reply disputing Respondents' assertion. ECF 20.

No hearing is necessary to resolve the matters pending before this Court. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2016); *see also Fisher v. Lee*, 215 F. 3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. §2254(e)(2)). For the reasons stated below, the Petition for Writ of Habeas Corpus shall be denied and a certificate of appealability shall not issue.

## I. Trial and Conviction

French was tried by a jury in the Circuit Court for Baltimore County in connection with the October 31, 1993[1] armed robbery of Brian Sherry and the shooting of police officer James Beck. Evidence produced at trial through the testimony of Brian Sherry established that he was robbed after a woman in a pick-up truck that was following him down Pulaski Highway pointed a gun out of the window and demanded he turn down Chesaco Avenue. ECF 4-2 at 167. When Mr. Sherry stopped his car in a church parking lot the woman, who he later identified as Heather Kendall, came up to his car and demanded his wallet, but Mr. Sherry refused. *Id*. at 169-70. Another car pulled in behind them and the other driver ran to the side of Mr. Sherry's car, stuck a black automatic pistol through the window and demanded that Mr. Sherry do what Ms. Kendall told him to do. *Id*. at 170-71. Mr. Sherry gave Ms. Kendall his wallet which contained $43; Ms. Kendall took the money, returned the wallet, and fled the scene along with her accomplice. *Id*. at 172. Mr. Sherry described the pick-up truck that Ms. Kendall and her accomplice drove and explained he later saw the same truck at a Royal Farm store. *Id*. at 174.

Baltimore County Police Officer James Beck was shot later that same evening. Officer Beck was in a patrol car in the area of Pulaski Highway and was accompanied by a ride-along student, Sandra Lowery, who witnessed the shooting and testified for the State. ECF 4-2 at 181-201. Ms. Lowery explained that there was a call on the radio to be on the lookout for a brown Ford truck with wooden racks. *Id*. at 184. Ms. Lowery and Officer Beck saw a truck fitting that

---

[1] French asserts, and Respondents do not dispute, that when he was granted a new appeal by the post-conviction court on February 20, 2015, the one-year filing deadline for federal habeas relief began anew. ECF 1 at 3 and 5. The Court of Special Appeals denied French's request for relief on June 10, 2016 and his petition for writ of certiorari filed with the Court of Appeals was denied October 21, 2016. ECF 4-10 and 4-11. His petition for writ of certiorari filed with the United States Supreme Court was denied on October 2, 2017. ECF 1 at 5. French filed his petition in this Court on March 20, 2018. *Id*. at 6 (signature and date).

description during their travel on Pulaski Highway and saw two people inside the truck. *Id*. at 185-6. Officer Beck followed the truck, turned on the overhead lights, and the truck pulled over immediately. The driver of the truck, later identified as Mark French, rolled down his window and the passenger, Heather Kendall, did not move. *Id*. at 186. Beck approached the truck with his right hand on his gun; when he got slightly ahead of the front of his car, the driver of the truck spun his right arm and part of his head out of the window and began firing the gun. *Id*. 187; 205.

Officer Beck testified that he saw the muzzle flash from the first shot and felt pain in his left shoulder, causing him to stagger backward. ECF 4-2 at 205. He felt a second pain in his chest area and began to try to get between the two vehicles. *Id*. He could not recall the third shot, but said he later found out it hit him in the chest and caused him to fall to the ground between the two vehicles. *Id*. Officer Beck recalled hearing the tires squealing as the pick-up truck raced off; hearing voices around him reassuring him; and the sound of a helicopter landing, but could not remember anything else until a month and a half later. *Id*. at 207. He testified that he was hospitalized in Shock Trauma for two and a half months and then hospitalized at "Good Sam" for therapy to treat nerve damage to his arm and legs which he stated is permanent.[2] *Id*. at 208. Officer Beck also testified that the medications he received in the hospital worked on his central nervous system which caused the messages relayed from his ears to his brain to no longer work, leaving him with progressive hearing loss. *Id*.

---

[2] Dr. Steven Z. Turney, the surgeon who treated Officer Beck, testified that the initial assessment included a partially collapsed right lung as well as blood in the right chest cavity. A chest tube was inserted to alleviate the pressure and to help Officer Beck breathe. Three bullets were seen on x-ray: one in the left shoulder and two in the lower back. Dr. Turney explained that one bullet went through Officer Beck's right lung and another lodged in his left shoulder; the third bullet went through his abdomen on the right side, shattering a rib. The rib fragments had perforated both the small and large intestines in several places, causing the contents to leak into the abdominal cavity. Officer Beck was placed on an artificial lung because he was dying and his condition was deteriorating rapidly. ECF 4-3 at 88-96.

Detective Michael Peregoy investigated the armed robbery of Mr. Sherry as well as the shooting of Officer Beck and testified for the State at trial. ECF 4-3 at 3-34. Detective Peregoy recovered 9 mm spent cartridges from the scene as well as bullet fragments recovered from Officer Beck's body that were provided to him by a nurse at Shock Trauma. *Id*. at 14; 16-18. The police department elicited help from the public in identifying and locating the suspects involved in the shooting. *Id*. at 14. To assist in identifying the perpetrators, a forensic sketch artist worked with Brian Sherry to draw a composite sketch of the female who robbed him. *Id*. The Ford truck was recovered from the backyard of Lisa Morton's home. *Id*. at 19. Business cards with Mark French's name on them were found inside the truck. *Id*. at 23. After defense counsel cross-examined Detective Peregoy regarding the number of trucks that were called in matching that description and suggesting that not enough was done to develop more suspects (*id*. at 27-33), Detective Peregoy explained that all trucks reported as fitting the description and possible persons responsible were ruled out. *Id*. at 33-34.

Lisa Morton testified that Mark French came to her house on October 31, 1993, the day after the shooting at approximately 11 a.m., and told her he had taken $1600 for a roofing job he had not done and came across the guy who paid him which resulted in a shoot-out. ECF 4-3 at 57. She further testified that French had three guns with him: a .9mm Glock, a .38, and a .22. *Id*. at 59. French was holding the .9mm Glock in his hand and told Ms. Morton that it was dirty because he used it in the shoot-out. *Id*. at 60. Later in the evening, the news came on with a story about the shooting featuring the composite sketch and describing a white male involved in a police shooting; French was in the kitchen and came into living room to hear the news, he asked them to turn up the volume. *Id*. at 62. French said the sketch looked like Heather; Ms. Morton responded: "don't tell me that you shot the police." French told Ms. Morton that "it was either me or him."

*Id*. at 63.  French then told Ms. Morton about going to Pulaski Highway for Heather to pick up a "John" so they could rob him.  *Id*.  French said the "John" called the police and before they could get away, the police had come up to the truck and French shot the police officer with the .9 mm Glock.  *Id*. at 64.  The following morning, Ms. Morton went to University Hospital and spoke with the police officers[3] who were with Officer Beck to report what French had told her and to tell them his truck was in her backyard.  *Id*. at 67-68.

A tactical response team from the Baltimore City Police performed a raid on Lisa Morton's house on November 1, 1993, with the objective of locating the alleged suspect in Officer Beck's shooting and arresting him.  ECF 4-3 at 98-108.  The tactical team entered the house with a battering ram and found a white male, later identified as Mark French, in the kitchen.  *Id*. at 99-100.  French was taken to the floor, handcuffed, and taken into custody.  *Id*. at 101.  In addition, Heather Kendall was found in the same house.  *Id*. at 108.  After French was handcuffed, he was searched and .9 mm bullets were found in his left front pocket.  *Id*. at 111-12.  In addition, a black .9 mm Glock was recovered from a dish drainer on the side of the kitchen sink.  *Id,* at 116.

Additional evidence connecting Mark French to the crime was introduced through the testimony of Detective Walter Clipper of the Baltimore County Police; Jonathan Murphy for whom French worked; and William ("Bill") Martin, French's coworker.  A burglary had occurred at the home of Jonathan and Dawn Murphy one-day prior to the robbery of Mr. Sherry and the shooting of Officer Beck.[4]  In addition to investigating the burglary, Detective Clipper was also a part of

---

[3]        On cross-examination Lisa Morton admitted that she used and sold drugs, but denied she reported her conversation with French in order to collect the reward money.  ECF 4-3 at 71-84.  Rather, she testified on redirect that her brother had been murdered and although people knew who did it and why, nobody stepped forward.  She stated she reported French to the police in order to assist the family of Officer Beck; something nobody did for her family in similar circumstances.  ECF 4-3 at 86-87.

[4]        French was also charged with burglary and daytime housebreaking in a separate case; those charges were placed on the stet docket following the guilty verdict in the attempted first-degree murder case.  *See* ECF 4-4 at 83-4.  A pre-trial motion to sever, filed by the defense, was granted as to the burglary and breaking and entering which

the search and arrest team that went to Lisa Morton's house because he had information that evidence pertaining to the break-in was inside that house. ECF 4-3 at 126. The property stolen mainly consisted of rifles, shotguns, a couple of handguns, and cash. *Id*. When Ms. Morton's house was searched, approximately ten firearms, handcuffs, and magazines for rifles were located in the basement. *Id*. at 126-7. Also recovered from the residence was a 35 mm camera with the name "Dawn" on it believed to belong to Dawn Murphy. *Id*. at 127-8. The magazines recovered were determined to belong to Jonathan Murphy. *Id*. at 128. Under cross-examination Detective Clipper admitted that Dawn Murphy's initial report to police was that she thought French or his brother broke into their house because they were doing work on the house along with other people including Bill Martin. *Id*. at 139. Detective Clipper never spoke to Bill Martin, did not observe the handgun in the kitchen, and did not ask the Murphy's if the Glock belonged to them. *Id*. at 140, 143-45.

Jonathan Murphy testified that he had hired French to put siding, gutters, and a new roof on his home. ECF 4-3 at 152. The week before October 31, 1993, the work was near completion and Mr. Murphy struck up a conversation with French about his gun collection which he showed to French. *Id*. at 153-54. Mr. Murphy told French and Kendall that he and his wife were going to a Halloween party on Saturday October 30, 1993. *Id*. at 156. When they returned from the party at approximately 1:00 a.m., the saw their house had been burglarized and all the guns that were not locked up had been stolen. *Id*. at 157. In addition, Mr. Murphy stated that his wife Dawn Murphy is an auxiliary police officer and handcuffs, mace, and a vest belonging to her were missing. *Id*. at 158.

---

occurred on October 30, 1993. ECF 4-2 at 21. The motion was denied for severance of the armed robbery and attempted murder charges because in the trial court's view they constituted "one transaction occurring all relatively within the same time" and "the defendant is not entitled to a severance of those two events." *Id*.

Bill Martin testified that he worked on the Murphy's house the week before Halloween, 1993. ECF 4-3 at 166. Mr. Martin worked for French for one and a half years and claimed that after French had seen Mr. Murphy's guns stated that "he could sell the guns to his nigger friends in the City where he bought drugs." *Id*. at 167. Under cross-examination it was established that Mr. Martin frequently drove the truck that was used during the commission of the crime, but he said he never took the truck home. *Id*. at 170. Rather, French would pick him up at his house and then Martin would drive to their worksite.[5] *Id*. Mr. Martin also testified that there were only one set of keys to the truck. *Id*. at 172. Police came to Mr. Martin's house the day after the break-in at the Murphy's house; Mr. Martin's girlfriend let the police into the house and they looked around but did not search the house. *Id*. at 173. According to Mr. Martin, the police came to his house because French gave them his name and address and told them he was the one driving the truck the night before in an attempt to implicate Mr. Martin in the crime. *Id*. at 173-4.

Timothy Ostendarp, a latent print examiner with the Maryland State Police Crime Lab, testified as an expert that latent prints lifted from the truck matched both Mark French and Heather Kendall. ECF 4-3 at pp. 180-9.

Also testifying as an expert witness was Joseph Kopera,[6] who worked for the Ballistics Unit of the Maryland State Police. ECF 4-3 at 192-207. During the voir dire to qualify Mr. Kopera as an expert witness, Mr. Kopera stated that he held an engineering degree from the University of

---

[5]      It was established through the testimony of Marion Louise Suggs that French did not have a valid driver's license and that he hired Mr. Martin to drive the truck and pick up supplies. ECF 4-3 at 49. Ms. Suggs testified that Bill Martin sometimes took the truck home and that French had told her Martin robbed someone and when the police pulled him over he shot the police officer. *Id*.at 49; 44-45.

[6]      Joseph Kopera, who testified as an expert in hundreds of criminal trials in and around Maryland, was later discovered to have falsified his educational credentials. *Kulbicki v. State*, 207 Md. App. 412, 430 (2012) *rev'd on other grounds by* 440 Md. 33 (2014) (noting that parties stipulated that Kopera had lied about his credentials as he had not earned degrees in engineering as he alleged and had never been accepted to University of Maryland or Rochester Institute of Technology). After his fraud was discovered, Kopera committed suicide. *Id*. at n.9.

Maryland and from Rochester Institute of Technology. *Id*. at 193-4. Mr. Kopera further testified that he graduated from the FBI Academy with certifications in firearms identification and gunpowder residue, he was on the Board of Directors for the Association of Firearm and Tool Mark Examiners, and on staff of several colleges in the local area teaching in the fields of criminology and forensic science. *Id*. at 194. Following the voir dire, Mr. Kopera was accepted as an expert and testified that the bullets and cartridge casings recovered from the scene where Officer Beck was shot were fired from the Glock recovered during Mark French's arrest. *Id*. at 201. He further testified that the bullets recovered from Officer Beck's body were also fired from the same Glock. *Id*. Cross examination of Mr. Kopera focused on the commonality of the ammunition found in French's possession. *Id*. at 202-7.

At the close of the State's evidence, and after French's Motion for Judgment of Acquittal was denied (ECF 4-3 at 209-10), French was advised regarding his rights to testify and to remain silent and chose not to testify. *Id*. at 212. The defense offered no evidence. *Id*. at 214.

The jury returned a guilty verdict on first degree attempted murder, robbery, and two counts of use of a handgun in the commission of a felony. ECF 4-4 at 80-81.

On May 25, 1994, French was sentenced to serve life with consecutive sentences totaling 35 years, the first ten years of the consecutive sentences without possibility of parole. ECF 4-5 at 21-22. His request for a recommendation for commitment to Patuxent was denied as the trial judge believed that facility was not secure enough for the type of sentence imposed. *Id*. at 22.

## II.    Appeals and Post-Conviction

### A.    First Direct Appeal

On March 28, 1995, the Maryland Court of Special Appeals issued an unpublished opinion affirming French's conviction. ECF 4-6. On appeal, French raised one issue: Did the trial court

err in denying a motion in limine to exclude his prior burglary conviction *Id*. at 2. French's claim concerned the testimony of Detective Clipper and Jonathan Murphy regarding the prior break-in and the items stolen during the burglary. *Id*. at 4. The appellate court observed that the "[g]eneral rule is if the trial judge rules to admit the evidence the opposing party must object at the time the evidence is actually offered to preserve the issue for appellate review." *Id*. at 4; citing *Prout v. State*, 311 Md. 348, 356 (1988), also citing *Hickman v. State*, 76 Md. App. 111, 117 (1988). Turning to French's claim, the court observed that:

> The motion *in limine* was denied at the start of trial on April 11, 1994. The testimony relating to the burglary was not offered until the following day, after a lunch recess. The court did not restate its ruling on the motion *in limine* prior to the testimony at issue. Because appellant did not object when the evidence was offered, the issue has not been preserved for our review. *Hickman*, 76 Md. App. at 118.
>
> For the benefit of counsel, we add one final point. Evidence of other crimes may be admitted when it tends to show 'the identity of the person charged with the commission of a crime on trial.' *Ross v. State*, 276 Md. 664, 669-70 (1976). The type of evidence that may be admitted under the identity exception includes evidence of 'the defendant's prior theft of a gun, car or other object used in the offense on trial.' *Cross v. State*, 282 Md. 468, 477 (1978).

ECF 4-6 at 5-6.

### B. Post-Conviction Petition

In 2014, French filed a Petition for Post-Conviction Relief in the Circuit Court for Baltimore County asserting numerous claims for relief, including a claim of ineffective assistance of appellate counsel for failing to raise the claim that the trial court erred by failing to comply with Md. Rule 4-215(e) after it received a letter from French stating he wished to discharge trial counsel and for failing to raise a claim that the verdict was defective. *See* ECF 11-1 at 40-92; 124-37 (post-conviction transcript); ECF 4-7 (post-conviction court's decision). The post-conviction court found that appellate counsel's performance was deficient and granted French a new appeal limited

to the issues of whether the trial court erred when it failed to comply with Md. Rule 4-215(e) and the flawed verdict. ECF 4-7 at 38-39. Relief was denied on all other claims.[7] With regard to the ineffective assistance of appellate counsel for failing to raise the discharge of counsel claim, the post-conviction court observed:

> 'The two-pronged test enunciated in *Strickland* applies to claims of ineffective assistance of appellate counsel just as surely as it does to claims of ineffective assistance of trial counsel.' *State v. Gross*, 134 Md. App. 528, 556 (2000). While appellate counsel 'is not require[d] . . . to advance every conceivable argument on appeal which the trial record supports,' *id.* at 562 (quoting from *Gray v. Greer*, 800 F.2d 644, 647 (7th Cir. 1986)), 'when ignored issues are clearly stronger than those presented . . .[,] the presumption of effective assistance of counsel [will] be overcome,' *id.* (quoting from *Gray* 800 F.2d at 646). Where deficient performance of appellate counsel has been established, prejudice can be established by demonstrating that there was a 'substantial possibility' of success had an issue been raised on appeal. *Id.* at 555-56. In his case, Petitioner has met both prongs of the test enunciated in *Gross* and this Court will grant Petitioner a second appeal to the Court of Special Appeals.
>
> With respect to the performance of appellate counsel, this Court looks to whether the 'ignored' issue of the failure of the trial court to conduct the colloquy required by Md. Rule 4-215(e) was 'clearly stronger' than the sole issue raised in Petitioner's actual appeal, whether the trial court erred in denying Petitioner's motion *in limine* regarding a prior burglary Petitioner was alleged to have committed. *See Gross*, 134 Md. App. at 562. The Court of Special Appeals denied the appeal actually filed by Petitioner in a brief, unreported opinion of slightly more than four pages. *See French v. State*, No. 1277, Sept. Term 1994 (COSA unreported op., filed March 28, 1995) (*per curiam*). The Court of Special Appeals, citing to well-established Maryland law, held that the issue raised in Petitioner's appeal had not been preserved for review. *See French* at 3-4. The Court of Special Appeals also strongly implied, in a final paragraph that is entirely *dicta*, that, had it reached the merits of Petitioner's appeal, it

---

[7]    French raised thirteen claims for post-conviction relief, including the two claims the post-conviction court found meritorious. The remaining claims were (1) ineffective assistance of trial counsel for: (a) failure to inform the trial judge French wanted to discharge him (ECF 4-7 at 10-13); (b)failure to properly investigate credentials of Joseph Kopera (*id.* at 13-18); (c) failure to file a motion for modification of sentence (*id.* at 18-20); (d) failure to object to the flawed delivery of the verdict on attempted murder (*id.* at 21-23); (e) failure to cross-examine witnesses regarding the manufacturer of the ammunition recovered from French's pockets (*id.* at 35-36); (f) failure to request removal of an allegedly biased juror (*id.* at 36-38); (2) the State failed to comply with discovery requirements (*id.* at 23-25); (3) the trial court engaged in judicial misconduct for failing to address the request to discharge counsel (*id.* at 32-33); (4) he was deprived of a fundamentally fair trial because of the perjured testimony of Kopera (*id.* at 33-34); (5) the trial court committed judicial misconduct when the trial judge failed to take corrective action upon hearing the flawed verdict (*id.* at 34-35); and (6) the flawed reading of the verdict rendered it a nullity entitling French to a new trial (*id.* at 38-39).

> would have summarily rejected the appeal on the basis of other well-established Maryland law. *See French* at 4-5. In light of the ease with which the Court of Special Appeals rejected the appeal which Petitioner actually filed, this Court has no difficulty concluding that the issue raised by that appeal was not a "strong" issue.

ECF 4-7 at 26-27 (brackets and ellipses in original). By comparison, the post-conviction court found that French's potential claim for appellate review regarding his request for discharge of counsel not being properly addressed by the trial court was a strong one under well-established Maryland law. *Id*. at 28-31. French's letter, received by the trial court on April 8, 1994, seeking to discharge his trial attorney, John Henderson, was unequivocal and listed reasons for his desire to do so. *Id*. at 28. And, under Md. Rule 4-215(e), the trial court was required to permit French to explain the reasons for his request to discharge counsel and either (1) find the reasons meritorious and continue the case or (2) find the reasons without merit and inform French that the trial would proceed, but he would not be represented by counsel. *Id*. at 30. That colloquy did not take place on the record in French's case. *Id*.

The issue regarding the flawed verdict concerned the manner in which the trial court clerk asked the jury foreman to read the verdict for the attempted murder count. The following occurred:

> THE CLERK: Mr. Foreman, would you stand. What say you in case number 93-CR-4253, State of Maryland versus Mark P. French, as to attempted murder of James Beck. Not guilty or guilty as charged.
>
> THE FOREPERSON: Guilty as charged.
>
> THE CLERK: As to the use of a handgun in the commission of a felony, namely, attempted first degree or attempted second degree murder. Not guilty or guilty as charged?
>
> THE FOREPERSON: Guilty as charged.

ECF 4-4 at 80. French was charged with both first degree and second degree attempted murder which was indicated on the verdict sheet provided to the jury. Because the clerk did not specify

whether the attempted murder count the foreman was asked about was first or second degree, French argued that the verdict was defective and a legal nullity. ECF 11-1 at 131-3.

The post-conviction court first found that trial counsel was not ineffective for failing to raise an objection to the defective verdict because "even assuming it was a deficient act for . . . trial counsel to fail to object" the claim fails due to a lack of prejudice to French caused by that failure to object. ECF 4-7 at 22. The post-conviction court noted that the "Verdict Sheet makes it clear that, had Petitioner's trial counsel objected to the flawed verdict, the trial court would merely have corrected the error of the courtroom clerk and a proper verdict of guilty on Attempted First Degree Murder would have been entered." *Id.*, citing *Kelly v. State*, 162 Md. App. 122, 152 (2005), *rev'd on other grounds by* 392 Md. 511 (2006).

With respect to appellate counsel's failure to raise the flawed verdict issue on appeal, the post-conviction court held that the "verdict in Petitioner's case was flawed and the flaw was not capable of correction by the hearkening of the verdict." ECF 4-7 at 31. Further, the failure of trial counsel to object to the flawed verdict did not waive the issue for appeal under *State v. Santiago*, 412 Md. 28, 41-2 (2009). *Id.* The court then opined that "[i]n light of the well-established case law on the requirement that an oral verdict whether a defendant is being convicted of First Degree or Second Degree Murder . . ., Petitioner would have had a 'substantial possibility' of achieving success with this issue on appeal." *Id.* (citations omitted). Having already concluded that the issue actually raised on appeal was lacking in merit, the post-conviction court concluded that appellate counsel rendered ineffective assistance of counsel by failing to raise the flawed verdict claim on appeal. *Id.* at 32.

## C. Second Appeal (granted by post-conviction court)

As noted, French's second, new appeal was limited to the two issues his first appellate counsel failed to raise. The Maryland Court of Special Appeals rendered an unpublished opinion on June 10, 2016, denying relief on both claims. ECF 4-10. The appellate court, after reviewing the content of French's April 8, 1994 letter to the trial court asking the court to "hear my motion to dismiss John J. Henderson as my counsel" (*id*. at 2-3), analyzed the discharge of counsel claim as follows:

> On the morning of April 11, 1994, the case was called for trial before the Honorable James T. Smith, Jr. Both of appellant's defense counsel were in attendance. A reference in the transcript to discussions among the court and counsel 'in camera' indicates that there had been conversations in chambers before the case was called. At the outset of the pretrial proceedings on the record, Judge Smith confirmed that, except for two pending motions (namely, the defendant's motions for severance and for exclusion of his criminal record), and a motion for sequestration of witnesses, 'all open motions' had been 'withdrawn.' There was no express discussion of appellant's motion to discharge Mr. Henderson, but appellant was present when Judge Smith confirmed that, other than the three motions he mentioned, all other open motions had been withdrawn. And the record reflects that appellant was provided numerous opportunities to speak to the court.

ECF 4-10 at 5-6. Significant to the appellate court's analysis was the pre-trial colloquy during which the trial judge stated the following:

> THE COURT: It is my understanding that there are two motions, in addition to a motion for sequestration of witnesses. One is a motion for severance of various counts, the Defendants motion for severance of counts which I will have you describe in just a second, and another is a motion in limine relating to the criminal record of the Defendant.
>
> **Other than those two motions, are all open motions withdrawn?**
>
> MR. HENDERSON: **Yes, they are, Your Honor.**
>
> **THE COURT: Let the record reflect that all open motions are withdrawn other than those described by the court.** I'll hear from you on your motion for severance, Mr. Henderson or Mr. Gordon.

*Id.* at 6-7 (emphasis in original). The record reflects that French was in the courtroom at the time

this exchange took place. Later in the pre-trial proceedings, after a jury trial was elected, French

was advised by the trial court as follows:

> THE COURT: Counsel, would you approach the bench? Mr. French, would
> you also approach the bench?
>
> (WHEREUPON, COUNSEL AND THE DEFENDANT APPROACHED THE
> BENCH AND THE FOLLOWING ENSUED)
>
> THE COURT: Mr. French, I want you to understand that you have the absolute
> right to be present at all bench conferences when the lawyers come up to the
> bench. Do you understand that you have that right?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: I would like to have this understanding with you. If you want
> to attend a bench conference if we have a bench conference, you just come up
> with your lawyer. If you do not want to attend a particular bench conference,
> you just remain at the trial table. If you remain at the trial table I will assume
> that for that bench conference only you have elected to waive or give up your
> right to be present. Is that agreeable with you.
>
> THE DEFENDANT: Yes, sir?
>
> THE COURT: That does not mean that if you stay at the trial table for one
> bench conference that you can't come up afterwards. You can come up if you
> want or stay at the trial table if you want. Do you understand?
>
> THE DEFENDANT: Yes, sir.

ECF 4-10 at 10-11. In concluding that French's discharge of counsel claim was not preserved for

appellate review, the appellate court relied on the "affirmative statement that all other motions had

been 'withdrawn'" and that under Maryland law "withdrawing a motion, an affirmative act of

commission as opposed to an act of omission, constitutes a waiver rather than a forfeiture." *Id.* at

16, citing *Carroll v. State*, 202 Md. App. 487, 514 (2011). The court also observed that:

> At the time the trial judge in this case expressly confirmed in open court that all
> open motions (other than the three specifically identified) had been withdrawn,
> appellant was present and was also represented by a second attorney who was

> never the subject of a motion to discharge. Neither appellant nor Mr. Gordon took issue with the court's statement that all other motions had been withdrawn. And despite having numerous opportunities to renew the motion to discharge Mr. Henderson, appellant never did so. Under the circumstances he waived the motion to discharge Mr. Henderson, and the court did no err in failing to conduct further discussions on the record relative to the motion.

ECF 4-10 at 16-17.

With respect to the defective verdict claim, the Court of Special Appeals found that the clerk's omission of the words "first degree" was "corrected when the jury was asked to hearken to the verdict." *Id*. at 17. When the clerk asked the jury to hearken to the verdict the omitted words were included and the jury "responded affirmatively" when asked to confirm. *Id*. The appellate court noted that French had relied on *Williams v. State*, 60 Md. 402, 403-4 (1883) for his position that the hearkening was insufficient to correct the defective pronouncement, but "more recent cases from the Court of Appeals make clear that a verdict can be corrected during the hearkening." *Id*. at 17-18, citing *State v. Santiago*, 412 Md. 28, 38 (2009). The court concluded that French's "verdict was not finalized until the jury hearkened to it" and when the jury was hearkened it "confirmed its verdict that [French] was guilty of attempted first degree murder, as clearly reflected on the verdict sheet, and accurately stated in the clerk's hearkening inquiry." *Id*. at 19.

### D.      Claim in this Court

In his Petition for Writ of Habeas Corpus filed with this Court, French raises one claim, that his motion to discharge counsel was not properly addressed by the trial court. *See* ECF 1 at 5; ECF 1-1 at 26. French's Memorandum of Law in support of his Petition also goes into depth regarding the reasons he wanted counsel removed, his asserted educational disabilities that prevented him from raising the issue with the trial court, that the state courts' actions violated his Sixth Amendment right to counsel because there was an irreconcilable conflict between French

and trial counsel, and generally reiterates his claims of ineffective assistance of counsel in a bid to establish "prejudice" for the failure to entertain his motion to remove counsel. ECF 1-1 at 26-35.

Respondents assert that the issue presented to the state courts regarding his motion to discharge counsel was a matter of state-law that is not cognizable on federal habeas review and to the extent that French is raising a constitutional claim, that claim has been defaulted. ECF 4 at 16. Respondents also argue that any constitutional challenge asserted with regard to the State court's ruling on this claim survives scrutiny under 28 U.S.C. § 2254(d).

## Standard of Review

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings" *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005). The standard is "difficult to meet," and requires courts to give state-court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted); *see also White v Woodall,* 572 U.S.415, 419-20 (2014), quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.").

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state adjudication is

contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S.. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Id*. at 785 (internal quotation marks omitted).

Further under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id*. "[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly.*" Renico v. Lett,* 559 U.S 766, 773 (2010).

### Analysis

French's discharge of counsel claim that was first presented to the post-conviction court and later was the subject of a newly granted direct appeal, relied entirely on the contours and requirements of Maryland State law. Specifically, the error assigned to the trial court by French in his discharge of counsel claim was the failure to abide by Maryland Rule 4-215(e). *See* ECF

11-1 at 124-30 (Post-Conviction Transcript). Further, the post-conviction court's decision granting relief on the claim in the form of a second appeal and the Court of Special Appeals' decision were also based entirely on the application and interpretation of Maryland law. *See* ECF 4- 9 at 25-31 (post conviction court's decision) and ECF 4-10 at 14-17 (Court of Special Appeals decision). Violation of a state law which does not infringe upon a specific constitutional right is cognizable in federal habeas corpus proceedings only if it amounts to a "fundamental defect which inherently results in a complete miscarriage of justice." *Hailey v. Dorsey*, 580 F.2d 112, 115 (4th Cir. 1978) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)), *cert. denied*, 440 U.S. 937 (1979), *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas corpus court to reexamine state court determinations on state law questions.").

In his Reply, French asserts that "it is unreasonable for the Respondents to state this violates only a State rule or law" because "Md. Rule 4-215(e) was made to protect a defendant's Sixth Amendment rights." ECF 20 at 2, citing *Johnson v. State*, 355 Md. 420, 426 (1999) (holding trial court erroneously found criminal defendant waived his right to counsel by failing to comply with application procedures for representation by public defender's office). French's reliance on the *Johnson* decision does not assist his argument as the decision focused on Maryland Rule 4-215(a), setting forth requirements of a trial court when a defendant makes a first appearance without counsel, and did not address the Md. Rule 4-215(e), governing the colloquy to take place when a criminal defendant requests permission to discharge an attorney whose appearance has been entered. The difference in the two sections of the rule cannot be overlooked. In the first instance the criminal defendant is unrepresented by counsel and the trial court is charged with ensuring he or she is well aware of their rights. Md. Rule 4-215(a). In the second instance the criminal defendant is represented by counsel and the trial court is charged with ensuring he or she knows

what will occur if counsel is discharged without cause. Md. Rule 4-215(e). French cites to no legal precedent stating that the colloquy required by Md. Rule 4-215(e) is mandated by the United States Constitution, nor can he. Thus, the state courts were never presented with a Sixth Amendment claim in the context of French's motion to discharge counsel and this Court may not revisit the matter. *Estelle*, 502 U.S. at 67-68. Having found no cognizable federal claim for relief, the Petition for Writ of Habeas Corpus shall be denied.

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U. S.C. § 2253(c)(2); *see Buck v. Davis*, 137 S.Ct. 759, 773 (2017). The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because this Court finds that there has been no substantial showing of the denial of a constitutional right, a certificate of appealability shall be denied. *See* 28 U. S.C.§ 2253(c)(2). Petitioner may still request that the United States Court of Appeals for the Fourth Circuit issue such a certificate. *See Lyons v. Lee*, 316 F.3d 528, 532 (4th Cir. 2003) (considering whether to grant a certificate of appealability after the district court declined to issue one).

A separate Order follows.

_____3/27/2020_____                         _____/s/_____
Date                                                                    RICHARD D. BENNETT
                                                                            UNITED STATES DISTRICT JUDGE